**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHRISTOPHER NEAL MISHIK,<br><br>Defendant. | Case No. 1:26-CR-115<br><br>Hon. Patricia Tolliver Giles<br><br>Sentencing: October 8, 2026 |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

A Licensed Professional Counselor is trained to do one thing before undertaking anything else: earn a child's trust. Christopher Mishik made his living that way. He offered mental health counseling to patients that included adolescents, young adults, and families. Dkt. 34 at 2.

In the summer of 2024, he put that training to a different use. On July 24, 2024, while the adult men of an Instagram group called "Good Girls" pressed a 14-year-old girl with Down Syndrome to expose herself on camera, the defendant stepped into a private side conversation with one of them to assess the child. "[MV1] seems shy," he observed. He asked whether she was more effectively "dominated convinced or complimented convinced." He asked, "She can't read?" Told that she could not read very well and that the chat was "prolly crazy for her," he replied, "Fuck lol," mused that he would "[n]eed a voice change[r] to direct her," and suggested that the other man send her a voice message instead. *Id.* at 10. From a second account, he opened a private conversation with the child. "What can I do to help?" he asked her. "Do you want suggestions on what videos to send?" "Can u send it to me first if you don't want to send it to the group? I can help build confidence." *Id.* at 11.

The next day, when a 10-year-old girl hesitated to send a photograph because she feared being grounded, it was the defendant who soothed her: “lol why would you get grounded? No one would know.” And when she agreed to send a single photograph on the condition that nobody screenshot it, it was the defendant who assured, “Ur safe here.” *Id.* at 6(c).

That is a counselor’s skill set. Assess the child. Identify what she responds to. Build her confidence. But rather than utilize these skills to do what a counselor is trained and trusted to do—help patients—he employed them in a campaign of child exploitation. He exploited children individually and behalf of a dangerous enterprise of adult men working in tandem to most effectively victimize the most vulnerable population. And the defendant did not merely participate in a child exploitation enterprise; he brought a professional’s expertise to it.

The defendant now comes before the Court for sentencing after having pleaded guilty to one count of Child Exploitation Enterprise, in violation of 18 U.S.C. § 2252A(g). The applicable guidelines range has been correctly calculated in the Presentence Report (“PSR”) as life imprisonment. Dkt. 37 at 88. The statute carries a mandatory minimum term of 20 years of imprisonment. For the reasons below, the United States respectfully recommends that the Court impose a sentence of 30 years in prison followed by a lifetime of supervised release.

## BACKGROUND[1]

### I. Factual Summary

#### A. The “Good Girls” Enterprise

From on or about June 18, 2024 until at least September 13, 2024, the defendant participated in an Instagram group of adult men who titled themselves “Good Girls.” Dkt. 34 at

[1] The following facts are derived from the Statement of Facts, Dkt. 34, the PSR, Dkt. 37 or discovery previously provided to defense counsel. Minor victims are identified as they are in the Statement of Facts. The full names of the victims are known to the parties and law enforcement.

1, 4. The group's purpose was singular: to find, share, and produce child sexual abuse material (CSAM). *Id.* at 4. Approximately 46 usernames engaged in the enterprise over that span; at least 20 were actively messaging on an approximately weekly basis; and at least 10 adult males have been positively identified as members. *Id.* at 5. The defendant was one of them, and he employed two accounts to do it. *Id.*

The enterprise's methods were coordinated and rehearsed. Members lurked on young girls' social media accounts to record their "live streams," taking screenshots or recording the stream whenever they anticipated an escalation to nudity or sexual activity, and sent the results to one another. *Id.* at 4(a). They traded the usernames of particular girls as recommendations for other members to target. *Id.* They commented during girls' live streams to encourage sexually explicit activity on camera. *Id.* at 4(b). They invited girls into the group chat so the men could jointly encourage the girls' sexual behavior. *Id.* at 4(c). They privately messaged girls—often pretending to be teenage boys—to persuade, induce, and entice them to create and send CSAM and to join the larger chat, and then coordinated with one another to share knowledge about targeted girls and exchange the content each had acquired. *Id.* at 4(d). Some members posed as other young girls to encourage a targeted child to "join her or compete with her" in sending CSAM, after which the men would compare the children in the chat. *Id.* at 4(e). And when a child expressed fear about sending images of herself, members reassured her that she was in a "safe place." *Id.* at 6(e).

The defendant's phone reflects his part in the collection effort. Among the recordings saved to it was a video of three minor girls that begins with them lying on a bed chewing bubble gum and ends with two of them removing their pants and exposing themselves to the camera;

another captures a girl removing her shorts and penetrating herself with a long, thin object. *Id.* at 4(a).

In sum, the enterprise engaged in at least three separate instances of Sexual Exploitation of a Child, in violation of 18 U.S.C. § 2251, and dozens of instances each of distribution and receipt of CSAM, in violation of 18 U.S.C. § 2252A(a)(2). *Id.* at 8. It victimized at least six identified minor girls, and the differently named groups in which its members—including the defendant—collaborated over the same period collectively victimized at least ten. *Id.* at 7.

### B. The Enterprise at Work: July 23–28, 2024

#### *1. The Apparent Minor Victim (AMV)*

On July 23, 2024, the group added to its chat an account that appeared to belong to a young girl, the Apparent Minor Victim ("AMV").[2] *Id.* at 6(a). The men greeted her with a barrage of videos and images, mostly sexual in nature, including scantily clad children and anime depicting children engaged in sexual activity. *Id.* When the account sent a photograph of AMV in her bedroom in a two-piece bikini patterned with flowers and rainbows, the campaign began. "Can you show us more??" "So sexy. pull your panties to the side and show." "Do it [AMV]." The defendant joined in: "Fuck me, [AMV] is hot." *Id.* Within the same exchange, the account sent images of the approximately 10-year-old completely naked, and a video panning from her exposed body up to her smiling face. *Id.*

The defendant suspected the account was not what it claimed to be. In the middle of the distribution, he messaged another member: "[AMV's account name] a fish?" And then: "I think it's a dude but I'm not opposed to what they're doing[.]" *Id.* at 6(a) n.1. Whether the person

---

[2]The account that shared AMV's images was not operated by AMV herself. As some adult males in the group pretended to be minor girls, the user of the account appeared to be posing as AMV—what the group called "a fish." Dkt. 34 at 6(a) n.1. AMV has been fully identified, interviewed, and confirmed her identity in the media shared in the group, and confirmed she was approximately 10 years old in the images and videos. *Id.*

sending sexual images of a 10-year-old was the child or an adult impersonating her, the defendant was "not opposed."

2. *Minor Victim 1 (MV1)*

On July 24, 2024, the group added Minor Victim 1 ("MV1"), a then-14-year-old girl with a type of Down Syndrome who resides with her father in a small town in the Eastern District of Virginia. *Id.* at 6(b), 9. The defendant was among the first to greet her: "Hi [MV1] :)." *Id.* at 6(b). What followed over the next four days was a coordinated campaign to obtain CSAM from a disabled child, and the defendant—operating both of his accounts—was among its most persistent voices:

| **July 24, 2024** | |
|---|---|
| **Sender** | **Content** |
| User 3 | Can you send a quick video of you rubbing yourself or sliding your fingers inside? |
| User 2 | [MV1] wanna join [AMV]? |
| **MISHIK ACCOUNT 1** | Hi [MV1] :) |
| MV1 | Sure |
| **MISHIK ACCOUNT 1** | U guys should try to up each other |
| **MISHIK ACCOUNT 1** | Both of you are beautiful but I think [MV1] might be hotter |
| User 2 | Ok....[MV1]...ur turn. |
| **MISHIK ACCOUNT 1** | [MV1]! [MV1]! [MV1]! |
| User 1 | Don't worry about the chat, we're just encouraging you |
| User 1 | Wanna start with your perfect tits? |
| MV1 | *[MV1 sends an image of her shirt and bra pulled down, exposing her breasts]* |
| **MISHIK ACCOUNT 1** | Oh fuck yeah!! |
| **MISHIK ACCOUNT 1** | [MV1] let's see them legs girl [emoji] and then some |
| User 2 | *[sends a video of an adult man penetrating a woman from behind while slapping, suffocating, and strangling her]* |
| **MISHIK ACCOUNT 1** | [MV1] where u at cutie |
| MV1 | *[MV1 sends a video that pans from her face—eyeglasses on, Taylor Swift decorations in the background—down to her exposed breast]* |
| **MISHIK ACCOUNT 2** | Amazing!!! |
| **MISHIK ACCOUNT 1** | Can we see your down there area? |

| **July 24, 2024** | |
|---|---|
| **Sender** | **Content** |
| User 2 | [MV1].... dont be shy .... let us see u completely naked.... like how [AMV] showed |
| **MISHIK ACCOUNT 1** | [MV1] is sexy as hell |
| MV1 | *[MV1 sends a mirror selfie pulling her shirt and bra down, exposing her breasts]* |
| **MISHIK ACCOUNT 1** | Wow! [MV1] you have great tits! More [MV1] more!!!!! |
| **MISHIK ACCOUNT 2** | They are perfect |
| **MISHIK ACCOUNT 1** | I'm sure she has a lovely pussy |
| MV1 | *[MV1 sends an image of her lower body, exposing her pubic area]* |
| User 2 | Spread those legs beautiful |
| **MISHIK ACCOUNT 1** | That's a meal is what that is |
| MV1 | *[MV1 sends an image of her vaginal area, seated on a toilet with her legs spread open]* |
| **MISHIK ACCOUNT 1** | Fuck yes! |

*Id.* at 6(b). The defendant returned to her the following day, and again three days after that, with the same script: "[MV1] are you still around" — "[MV1] show us something" — "Everyone wants you [MV1]." *Id.* On July 28, 2024, another member asked MV1 to "make a video trying to put something in ur coochie." She answered, "I've never done that." He pressed: "Could you try? Maybe just start with one finger to start." She sent a video fondling her exposed vulva. *Id.* When another minor in the chat asked how old MV1 was and MV1 answered, "I am 14," that same member responded: "We try not to talk about age here if that's ok." *Id.*

*3. Minor Victim 4 (MV4)*

The youngest known victim of "Good Girls," Minor Victim 4 ("MV4"), was 10 years old. *Id.* at 6(c). When she first entered the group, she was reluctant to share images of herself because she feared being grounded or losing her social media privileges. *Id.* The defendant stepped in to ease that fear—"lol why would you get grounded? No one would know"—and another member followed: "the pics and vids disappear, which is good[.]" *Id.* MV4 grappled

with the pressure as the men alternated between calming her and praising the other girls for exposing their bodies. *Id.* On July 25, 2024, she relented:

| **July 25, 2024** | |
|---|---|
| **Sender** | **Content** |
| MV4 | I Will try but I'm only doing one photo [emoji] |
| MV4 | And nobody screenshot it because it will make me feel uncomfortable [emoji] |
| **MISHIK ACCOUNT 1** | Ur safe here |
| User 3 | We won't..promise |
| MV4 | *[MV4 sends an image of herself holding the bottom of her shirt under her chin, exposing her bare chest]* |
| **MISHIK ACCOUNT 1** | [Flame emoji] |
| MV4 | Is it OK if I wait for another person to do it and then I will do it [emoji] |
| MV4 | My turn [emoji] |
| MV4 | *[MV4 sends a photograph of herself in the mirror, holding her shirt under her chin and exposing her bare chest and stomach]* |
| MV4 | I'm also doing my homework [emoji] |
| User 2 | Umm maybe loose ur pants to |
| MV4 | Maybe when I get more comfortable [emoji] |
| MV4 | I need to warm up first [emoji] |
| **MISHIK ACCOUNT 1** | Let's get [MV4] warm! ... |
| MV4 | No like the homework that the teacher gave me over the summer break [emoji] |
| MV4 | *[MV4 sends an image between her belly button and her upper thigh, exposing her bare vagina]* |
| **MISHIK ACCOUNT 1** | Gotta get [@MV1] in on this |

*Id.* She was 10. She was doing her summer homework between photographs. As the chat progressed, MV4 continued to send CSAM at the group's encouragement, and eventually sent a video—pants off, a pink lemon-patterned t-shirt held under her chin—in which she rubs her bare vagina with the handle of a brush. *Id.* at 6(d). On the floor behind her sat an open package of Oreo cookies. *Id.* The men responded, "Yummy! You are such a good girl" and "Wow! Can you fit it inside??," and then instructed the 10-year-old how to masturbate—specifically, how to go

inside of herself and how quickly to penetrate herself. *Id.* As they praised her, MV4 and the other minor victims began sending videos of a similar nature. *Id.*

### C. The Defendant's Private Victimization of MV1

The group chat was not enough for the defendant. While the enterprise worked MV1 in the open, he worked her in private, on two fronts.

First, on July 24, 2024, he opened a side conversation with User 1—the same member who would later coax MV1 into a video of her vulva—to compare notes on the child:

| **July 24, 2024** | |
|---|---|
| **Sender** | **Content** |
| **MISHIK ACCOUNT 1** | [MV1] seems shy |
| User 1 | She always does |
| User 1 | Idk why, she always shows |
| User 1 | But she just starts over every time |
| **MISHIK ACCOUNT 1** | Seriously starting over.... Lol |
| User 1 | I think she likes being convinced |
| **MISHIK ACCOUNT 1** | Like dominated convinced or complimented convinced |
| User 1 | Complimented |
| **MISHIK ACCOUNT 1** | She can't read? |
| User 1 | Not very well, this is prolly crazy for her |
| **MISHIK ACCOUNT 1** | Fuck lol |
| User 1 | Ikr |
| **MISHIK ACCOUNT 1** | Need a voice changed to direct her lol |
| User 1 | I don't lol |
| **MISHIK ACCOUNT 1** | Then send her a voice message lol |
| **MISHIK ACCOUNT 1** | She'd be scared of mine |
| **MISHIK ACCOUNT 1** | [MV1] is hot as shit |
| **MISHIK ACCOUNT 1** | She's so shy tho lol |

*Id.* at 10. This is not the language of a man swept up in a chat. It is a clinical assessment: what does this child respond to, what are her limits, and what is the most effective way to "direct her" past them. User 1 took the assessment to heart. During the same July 24 to 28 chat that led to MV1's production of CSAM depicting her vulva, he told her: "Don't worry about the chat,

[MV1], you can read it all when your[sic] done." "[MV1], could we get a little more from you before you read all the chat?" *Id.*

Second, that same day, from his other account, the defendant messaged MV1 directly. *Id.* at 11. He asked what she was doing, noted she was "in good girls," and observed, "It's a fun group, it can be a lot tho." *Id.* Then: "Holy shit u r hot." "Wow u should show all the time. R u ok with that? Because u r gorgeous and the world needs to see u." "Everyone wants you to show some more :) Will you please?" *Id.* MV1 answered, "I will just show my tits." *Id.* The defendant directed the shot—"You should squeeze them together in a video," "Can you squeeze them together with both hands? Just like smoosh them into each other"—and then asked, "You are going to show everything?" *Id.* When she said yes, he offered his services: "Yessss! You are the hottest girl I have ever seen. What can I do to help?" *Id.* She said she did not know. He asked, "Do you want suggestions on what videos to send?" *Id.* When the video did not arrive, he coaxed: "Are you making the video cutie? Can u send it to me first if you don't want to send it to the group? I can help build confidence." "They practically chant your name lol." "It seems like you don't want to send that." "Pull your panties to the side for a picture." "Would you send just me a pic?" *Id.* She did. *Id.* He replied: "Omg! You are soooo hot! How about a pussy pic? Spread for me?" "Show those pussy lips and spread with two fingers. If you want ?" "You have the cutest pussy I have ever see. Keep going please." *Id.*

The conversation resumed that evening and continued into July 25, 2024. *Id.* at 12. MV1 asked the defendant how old he was. He told her to guess. She guessed 13. Posing as a teenage boy, the defendant replied, "lol yeah nice. How old r u." She told him to guess. He guessed 14. She confirmed it, and they discussed the grade each was entering. *Id.* Having established that he

was speaking with a 14-year-old, the defendant kept going.[3] *Id.* at 13. "Can I get a personal pics of just you for me :)." "How about a video just for me :) of you flashing." "Do you prefer talking privately or to the group?" ("Privately," she said.) "Send me a pic of you bent over." "Oh I meant I wanted to see your butt [emoji]. Can you do that?" "You have a nice ass." "Can I see it with your shorts off?" "Can I see it with panties off too. Would that be ok?" "Would u rather do it on a video call? I can't join but I can still message you :) it could be fun." "I am sad you aren't answering." "Please [MV1]." "Ok send without any undies on and your legs spread. Would that be ok?" "Do you like to play with it down there?" "Let me see then." "It doesn't seem like you want to send it. Is that true?" "Can I see with your shirt off again? So hot." *Id.*

### D. The Defendant's Continued Exploitation Through November 2025

The defendant's participation in "Good Girls" ceased in 2024. His conduct did not. He continued similar behavior up to at least the day before law enforcement executed a residential search warrant at his home in November 2025. *Id.* at 14. His phone contained numerous recorded sessions of young girls' live broadcasts on social media, some of which culminated in nudity or sexual activity. *Id.*

By then, the defendant's primary means of acquiring CSAM was automated. He used programs on specialized applications to detect and collect CSAM and used automated programs to share CSAM with others. The programs amassed media other users had collected and shared, as well as media the defendant himself shared with them. *Id.* at 15. One such program was governed by rules. To gain entry, a prospective member had to send five media files within 30 minutes to unlock the group's content. *Id.* at 16. The defendant unlocked it. *Id.* He was then

[3] Due to the platform's retention policies, the attachments MV1 sent to the defendant in this private conversation were not retrievable. Dkt. 34 at 13 n.2.

welcomed as an "active member" and, seconds later, given the group's content rules: "Girls Focused Media Only !!" with "No Adult Porn or Nude Adults" and "No Boy focused media." *Id.* at 16–17.

The volume was staggering. On November 12, 2025, media appeared from approximately 20 different participants. *Id.* at 18. Over the 48 hours preceding the seizure of his phone, the program on the defendant's phone amassed more than 2,000 videos and 270 photos. *Id.* The defendant saved 12 of those videos and messages to his personal account associated with the program. *Id.* He also discussed CSAM with another user on TikTok, remarking of one image of a girl, "I like the last one the white dress almost falling out." *Id.* at 19.

**E. Possession and Concealment**

On November 12, 2025, law enforcement executed a residential search warrant at the defendant's home, where he lived with his wife and then-toddler daughter. *Id.* at 20. His phone locally stored 5 videos and 10 photos depicting CSAM, and additional CSAM was located in the group thread and cloud storage of an application housed in the hidden applications of his phone. *Id.* The content was not limited to the adolescents he had targeted in 2024. Among the images were three depicting toddler-aged girls, including one in which a pen or marker is inserted into a toddler's anus and another into her vagina. *Id.* at 20(a)–(c).

The defendant took considerable care to make sure none of this would be found. With the exception of one single instance—the instance that led to the search warrant in this case—he used a virtual private network to access the two Instagram accounts he used to exploit children, anonymizing his traffic and location. *Id.* at 21(a). Those two accounts were used entirely for his child exploitation pursuits; the defendant otherwise operated a public-facing Instagram account in his real name and posts consisting mostly of family photos. *Id.* at 21(b). And he kept the

applications he used for child exploitation in a hidden folder on his phone that took numerous steps to locate, was protected by his phone's passcode, and contained five applications that were each protected by an additional, unique passcode. Several were encrypted. *Id.* at 21(c).

## II. Procedural History

On March 13, 2026, the government filed a Criminal Complaint and supporting Affidavit charging the defendant with Sexual Exploitation of a Child and Attempted Sexual Exploitation of a Child, in violation of 18 U.S.C. § 2251(a) and (e). Dkt. 1. A warrant was executed on March 16, 2026. On March 20, 2026, the Honorable William B. Porter held a preliminary and detention hearing at which the defendant waived the preliminary hearing. After a detention hearing, the defendant was released with conditions of release. On June 17, 2026, the defendant appeared before this Court and, pursuant to a written plea agreement, pleaded guilty to a one-count Criminal Information charging Child Exploitation Enterprise, in violation of 18 U.S.C. § 2252A(g). Dkt. 30, 32, 33. The Court accepted the plea and continued the matter for sentencing, which is scheduled for October 8, 2026.

## III. Sentencing Analysis

### A. Statutory Penalties and Guidelines Calculations

#### *1. Statutory Penalties*

Child Exploitation Enterprise, in violation of 18 U.S.C. § 2252A(g), carries a mandatory minimum term of imprisonment of 20 years and a maximum term of life imprisonment. The offense also carries a term of supervised release of at least five years and up to life, 18 U.S.C. § 3583(k); a fine of up to $250,000; a mandatory $100 special assessment, 18 U.S.C. § 3013; a $5,000 assessment under the Justice for Victims of Trafficking Act, 18 U.S.C. § 3014; and an

assessment of up to $50,000 under the Amy, Vicky, and Andy Child Pornography Victim Assistance Act, 18 U.S.C. § 2259A.

### 2. *Guidelines Calculations*

The PSR correctly calculates the defendant's offense level under U.S.S.G. § 2G2.6 as follows. Dkt. 37 at 45–56.

| | |
|---|---|
| Base offense level (U.S.S.G. § 2G2.6(a)) | 35 |
| At least one victim had not attained the age of 12 years (U.S.S.G. § 2G2.6(b)(1)(A)) | +4 |
| A computer or interactive computer service was used in furtherance of the offense (U.S.S.G. § 2G2.6(b)(4)) | +2 |
| The defendant knew or should have known a victim was a vulnerable victim (U.S.S.G. § 3A1.1(b)(1)) | +2 |
| **Adjusted offense level** | **43** |
| Acceptance of responsibility (U.S.S.G. § 3E1.1(a) and (b)) | −3 |
| Repeat and dangerous sex offender against minors—pattern of activity involving prohibited sexual conduct (U.S.S.G. § 4B1.5(b)(1)) | +5 |
| **Total offense level** | **45** |

Because an offense level in excess of 43 is treated as a level 43, U.S.S.G. Ch. 5, Pt. A, cmt. n.2, the defendant's total offense level is 43. Dkt. Dkt. 37 at 52, 56. Put differently, the defendant's conduct exceeds the top of the Sentencing Table by two levels before the cap is applied. The defendant has no criminal history points, and his Criminal History Category is correctly calculated as I. *Id.* at 59–60; U.S.S.G. § 4B1.5(b)(2). His Guidelines range is therefore life imprisonment and five years to life of supervised release. *Id.* at Part D. The government moves for the additional one-level decrease under U.S.S.G. § 3E1.1(b) because the defendant timely notified authorities of his intention to plead guilty.

Although the defendant does not object to any of the PSR's adjustments, two warrant brief comment because they describe the core of his conduct. The vulnerable victim adjustment

applies when the defendant knew or should have known that a victim was unusually vulnerable due to physical or mental condition, or otherwise particularly susceptible to the criminal conduct, for reasons separate from the victim's age. U.S.S.G. § 3A1.1 cmt. n.2; *see United States v. Royal*, 442 F. App'x 794 (4th Cir. 2011) (unpublished) (affirming two-level vulnerable victim adjustment where minor victims were vulnerable not only because of their ages but for reasons separate from age). Chapter Two accounts for MV1's age; it does not account for her Down Syndrome. The defendant did. He asked, in so many words, whether she could read, learned that she could not read well and that the chat was "prolly crazy for her," and responded by discussing how best to "direct her." Dkt. 34 at 10. Then he privately solicited CSAM from her. *Id.* at 11–13.

The pattern enhancement under U.S.S.G. § 4B1.5(b)(1) applies because the offense of conviction is a covered sex crime and the defendant engaged in prohibited sexual conduct with a minor on at least two separate occasions. Dkt. 37 at 55. The defendant did so on far more than two: his solicitation of MV1 in the group chat on July 24, 2024, his separate private solicitation of MV1 that day and the next, and his solicitation of 10-year-old MV4 on July 25, 2024, are each distinct occasions, Dkt. 34 at 6(b)–(c), 11–13, and his conduct continued through November 2025. *Id.* at 14–20.

**B. Section 3553(a) Factors**

A sentence of 30 years of imprisonment is sufficient but not greater than necessary to reflect the totality of the defendant's conduct and comport with the purposes of sentencing set forth in 18 U.S.C. § 3553.

*1. The nature, circumstances, and seriousness of the defendant's offense*

Congress defined a child exploitation enterprise by its scale: a series of felony violations constituting three or more separate incidents, involving more than one victim, committed in

concert with three or more other persons. 18 U.S.C. § 2252A(g). Every element of that definition was a choice the defendant made and remade over the summer of 2024. He did not stumble into a group chat. He joined an enterprise of some 46 usernames whose purpose was to find, share, and produce CSAM, and he brought two accounts to it. Dkt. 34 at 4–5. He did not merely watch. He recorded children's live streams, traded the recordings, and encouraged the children on camera. *Id.* at 4(a)–(b). He did not merely encourage in the group. He took the most vulnerable child in the room aside, privately, and worked her one-on-one across two days. *Id.* at 11–13. And he did not stop when the enterprise did. He automated the acquisition, unlocking a program dedicated to "Girls Focused Media Only" by contributing five files of his own, and let it deliver thousands more. *Id.* at 15–18.

The in-concert element deserves particular weight. The design of "Good Girls" was that no child faced one man. She faced a room of them—some posing as teenage boys, some posing as other girls, all praising, daring, and comparing—so that a 14-year-old with Down Syndrome heard her name chanted, "[MV1]! [MV1]! [MV1]!," and a 10-year-old was told she was "safe here" by a chorus. *Id.* at 4(d)–(e), 6(b)–(c). The defendant supplied the chant and the reassurance. Each child was exploited many times over, by many men at once, and the enterprise's members then shared what they had obtained so that each man's success became every man's collection. *Id.* at 4(d). This group offending rewarded production and created both status and an audience ready for it. It supplied peer pressure on victims, shared coercion techniques, and cultivated a demand that outlasted any single group member.

What sets the defendant apart even within that enterprise is the expertise he brought to it. He was a Licensed Professional Counselor who counseled adolescents. *Id.* at 2. When he asked whether MV1 was "dominated convinced or complimented convinced," he was choosing a

technique. When he asked whether she could read, he was assessing her capacity. When he told MV1, "I can help build confidence," and told MV4, "Ur safe here," he was deploying the vocabulary of his profession to accomplish the opposite of his profession's purpose. *Id.* at 6(c), 10–11. Then, in the same breath, he told User 1 that the disabled child was "hot as shit." *Id.* at 10.

The harm is permanent. "Long-term studies show that sexual abuse is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways in which no just or humane society can tolerate." *United States v. Irey*, 612 F.3d 1160, 1207 (11th Cir. 2010) (en banc) (collecting authority). "When child pornography is produced in conjunction with the sexual abuse of children . . . the harm to the child victims is magnified and perpetuated." *Id.* at 1208. The images MV1 and MV4 were induced to create did not stay in the chat. The enterprise's members sent one another what they acquired, *id.* at 4(a), (d), and, as the Fourth Circuit has observed, such images are "a permanent record of the children's participation and the harm to the child is exacerbated by their circulation." *United States v. Burgess*, 684 F.3d 445, 459 (4th Cir. 2012) (quoting *New York v. Ferber*, 458 U.S. 747, 759 (1982)); *accord United States v. Accardi*, 669 F.3d 340, 345 (D.C. Cir. 2012). These children "must live with the knowledge that adults like [the defendant] can pull out a picture or watch a video that has recorded the abuse of [them] at any time." *United States v. Sherman*, 268 F.3d 539, 547–48 (7th Cir. 2001). MV4 is now a child who, at 10, was taught by a group of adult men how to penetrate herself, on video, with an open package of cookies on the floor. Dkt. 34 at 6(d). Videos like this and the ones MV1 produced are the videos that haunt these victims endlessly and the kind of nightmare parents, including MV1's father, live in fear of.

Additionally and unquestionably, the defendant also victimized the children he never spoke to. Trafficking in child pornography "harms children in part because it drives production [of child pornography], which involves child abuse." *Paroline v. United States*, 572 U.S. 434, 439 (2014). The automated program the defendant unlocked ran on exactly that principle: no member received until he had first sent. Dkt. 34 at 16. The toddlers depicted on the defendant's phone were abused so that men like him would keep feeding the machine. *Id.* at 20.

The Fourth Circuit has long held that "child pornography crimes are grave offenses warranting significant sentences." *United States v. Johnson*, 242 F. App'x 7, 11 (4th Cir. 2007); *see also United States v. Morace*, 594 F.3d 340, 350 (4th Cir. 2010) (noting "ample evidence of Congress's intent that offenses involving child pornography be treated severely"). An enterprise of adult men who coordinated to produce CSAM of a disabled 14-year-old and a 10-year-old, joined by a counselor who guided the effort, warrants that and much more. The nature of the defendant's crime therefore weighs in favor of a 30-year sentence.

*2. The defendant's history and characteristics*

The 36-year-old defendant held a professional license premised on the public's trust that he would protect the adolescents who confided in him. Dkt. 34 at 2. He committed this offense while employed as a therapist. He committed this offense in the same household he lived with his wife of five years and toddler daughter.

The absence of a criminal record here is not evidence of a law-abiding life; it is evidence of a well-hidden one. By his own stipulation, the defendant participated "[f]or years" in online groups that orchestrated the sexual exploitation of children. Dkt. 34 at 3. The "Good Girls" enterprise was one chapter, and the automated collection that followed it was another. *Id.* at 4, 14–18. Throughout, he maintained the architecture of a double life: a public Instagram account in

his real name with photographs of his family, and two accounts used for nothing but the exploitation of children; a VPN for every login but one; a hidden folder, behind a passcode, holding five applications, each behind its own passcode. *Id.* at 21. The man his patients, his wife, and his daughter knew was, by design, not the man in the chat.

The defendant's professional training makes his history more, not less, aggravating. He did not need to be told what grooming looks like or why a child with Down Syndrome is more susceptible to it. He knew. He is the rare offender who can describe the mechanism of his own crime in clinical terms—and did, in real time, to a co-conspirator. Dkt. 34 at 10.

*3. The need to promote respect for the law and provide just punishment*

Congress enacted federal criminal laws targeting child exploitation to address ongoing sexual abuse and victimization of children. S. Rep. 95-438, 5, 1978 U.S.C.C.A.N. 40, 42–43, 56. But this legislation and its later amendments are more than prophylactic measures. They reflect value judgments and the accepted moral norms of our society. As one Senate Judiciary Committee report concluded: "the use of children . . . as the subjects of pornographic materials is very harmful to both the children and the society as a whole," describing the conduct as "outrageous." S. Rep. 95-438, 5, 1978 U.S.C.C.A.N. at 43. Put differently, the defendant did not just violate federal law, he also transgressed universally recognized moral principles—the need to protect and nurture children and not to be titillated by depictions of their sexual abuse.

The defendant knew what he was doing was both harmful and illegal, and he continued doing it anyway. The VPN, the burner accounts, the hidden folder, and the five passcodes are not the habits of a man who thought he was doing nothing wrong. Dkt. 34 at 21. Neither is "No one would know." *Id.* at 6(c). This Court should craft a sentence that appropriately expresses social

condemnation of the defendant's crimes, captures the harm he has caused, and promotes respect for the rule of law. The government's recommended sentence does all three.

*4. The need for the sentence imposed to afford adequate deterrence and protect the public*

Both specific and general deterrence call for a significant sentence in this case. With respect to specific deterrence, the defendant's conduct spans years, escalated in method, and stopped only because law enforcement stopped it. He participated in exploitation groups "[f]or years" before "Good Girls." Dkt. 34 at 3. When "Good Girls" ended in 2024, he did not pause; he moved to automated programs that delivered more than 2,000 videos in two days, and he continued up to at least the day before the search warrant was executed at his home. *Id.* at 14–18. His interests were not confined to adolescents; his phone held images of toddlers, like his daughter. *Id.* at 20. And the only reason any of it came to light was a single lapse in his otherwise disciplined use of a VPN. *Id.* at 21(a). A man this careful, this persistent, and this practiced at earning children's trust presents a high risk of reoffending the moment he is able. His behavior was recurrent, calculated, and dangerous to society.

As the Supreme Court has noted, there are "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class." *Smith v. Doe*, 538 U.S. 84, 103 (2003). In fact, "[s]tudies and reports in this field are consistent with what judicial decisions show: pedophiles who have sexually abused children are a threat to continue doing so, and age does not remove the threat." *Irey*, 612 F.3d at 1214 (citing various studies and reports); *see also United States v. Allison*, 447 F.3d 402, 405–06 (5th Cir. 2006) ("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders."). The sentence imposed must therefore protect the public as long as possible and account for the specific danger he poses to minors.

General deterrence is especially important in cases like this one. The defendant operated within an enterprise of approximately 46 usernames; ten adult men have been identified. Dkt. 34 at 5. Many offenders believe they enjoy anonymity when they engage in this conduct over the internet, particularly when congregating with other like-minded individuals under pseudonyms, and the defendant's own precautions show how much he counted on it. *Id.* at 21. He and those who think like him need to understand that they risk lengthy prison sentences for this conduct and, perhaps, will decide the risk is too much. In the child pornography context, "the deterrence objective of sentencing is 'particularly compelling.'" *Irey*, 612 F.3d at 1211 (citation omitted). "[I]mposing a lighter sentence on one convicted of a child pornography offense 'tends to undermine the purpose of general deterrence, and in turn, tends to increase (in some palpable if unmeasurable way) the child pornography market.'" *Id.* (citation omitted); *accord United States v. Garthus*, 652 F.3d 715, 721–22 (7th Cir. 2011). That market is visible in this record: a program that admits new members only when they contribute CSAM, and that delivered media from approximately 20 participants in a single day. Dkt. 34 at 16, 18. The sentence in this case must constitute a loud and clear warning to those who would join such an enterprise that severe consequences will result.

**C. Supervised Release**

A lifetime of supervised release is warranted. "Supervised release . . . is not a punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Instead, it "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Under 18 U.S.C. § 3583(k), the authorized term of supervised release for the defendant's offense is at least five years and up to life. This five-year mandatory minimum term reflects a heightened concern for recidivism among sex offenders and the need for supervision

over time. *See* H.R. Rep. No. 107–527 at 2 (2002) (explaining that "studies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes" and that "the recidivism rates do not appreciably decline as offenders age"); H.R. Conf. Rep. No. 108-66, at 49–50 (2003) (discussing how amendment to 18 U.S.C. § 3583(k) "responds to the long-standing concerns of Federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders . . . whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison"). Notably, the Guidelines recommend a lifetime term of supervised release for sex offenders, U.S.S.G. § 5D1.2(b) (Policy Statement), which courts have observed "reflects the judgment of Congress and the Sentencing Commission that a lifetime term of supervised release is appropriate for sex offenders in order to protect the public." *United States v. Morace*, 594 F.3d 340, 351 (4th Cir. 2010) (quotation marks and citation omitted).

Based on an assessment of these factors, the United States recommends that the Court impose a lifetime of supervised release with the conditions of supervision described in 18 U.S.C. § 3583(d) for felons required to register under the Sex Offender Registration and Notification Act and those described in U.S.S.G. § 5D1.3(d)(7) for sex offenders. This defendant, in particular, demonstrated the ability to conceal his conduct behind encrypted, passcoded applications and anonymized connections for years, Dkt. 34 at 21, and a lifetime term of supervision—including computer monitoring—is necessary to limit his capacity to reoffend and provide him with steady access to the treatment and monitoring he clearly requires.

### D. Special Assessments Under the Justice for Victims of Trafficking Act (JVTA) and the Amy, Vicky, and Andy Child Pornography Victim Assistance Act (AVAA)

The Justice for Victims of Trafficking Act (JVTA) imposes a mandatory assessment of $5,000, per count, on any non-indigent defendant convicted of, among other offenses, an offense under Chapter 110 of Title 18.[4] 18 U.S.C. § 3014. While the statute is silent as to how to determine indigence, courts have treated the imposition of this assessment like the imposition of other post-conviction assessments, where "[t]he defendant bears the burden of proving both his inability to pay at the time of sentencing and that he is not likely to become able to pay a fine upon his release from his term of imprisonment." *United States v. Kelley*, 861 F.3d 790, 801 (8th Cir. 2017) (internal citations and quotation marks omitted). Relevant factors to consider in this determination include a defendant's future earning potential, assets, educational background, employment history, age, and physical condition. *See United States v. McMiller*, 954 F.3d 670, 675 (4th Cir. 2020) ("[W]e agree with our sister circuits that a district court may consider a defendant's future earning potential when determining his ability to pay an assessment under 18 U.S.C. § 3014(a)." (citations omitted)); *see also United States v. Mann*, 770 F. App'x 649, 650 (4th Cir. 2019).

The defendant is not indigent. Following his arrest, his parents loaned him $100,000 to help with expenses, and the defendant cashed in his retirement accounts to repay $54,000 of that loan. Dkt. No. 37 at 86, n.3. A defendant who can liquidate retirement accounts to return $54,000 to his family within months of his arrest has the means to satisfy a $5,000 assessment for the benefit of victims of the very offense he committed. Beyond his present assets, the Court should

[4] The money obtained from this assessment goes to the Domestic Trafficking Victims' Fund, which awards grants and enhances programming for victims of human trafficking and child pornography. The § 3014(a) assessment is payable after the defendant has satisfied all outstanding court-ordered fines, orders of restitution, and any other obligation related to victim compensation. *See* 18 U.S.C. § 3014(b) & (e).

consider the defendant's young age, graduate-level education, and history of licensed professional employment. *See* 18 U.S.C. § 3613 (noting that the liability to pay a fine or restitution shall terminate the later of 20 years from the entry of judgment or 20 years after the release from imprisonment, whichever is later); *see also United States v. Graves*, 908 F.3d 137, 141 (5th Cir. 2018). Accordingly, the United States respectfully requests that the Court find the defendant non-indigent and impose the mandatory $5,000 special assessment under 18 U.S.C. § 3014.

On December 7, 2018, Congress enacted the Amy, Vicky, and Andy Child Pornography Victim Assistance Act. The Act instructs that, in addition to any restitution or other special assessment, courts shall assess not more than $50,000 on any person convicted of a child pornography production offense. 18 U.S.C. § 2259A(a)(3).[5] The defendant's offense is one of production: the series of felony violations constituting the enterprise included at least three violations of 18 U.S.C. § 2251. *See* 18 U.S.C. § 2259(c)(1); Dkt. 34 at 8. In determining the amount to be assessed under § 2259A, courts should consider the sentencing factors set forth in § 3553(a) and the guidance in § 3572 for the imposition of fines. § 2259A(c). Given the scale of the enterprise, the number of children it victimized, the defendant's role in inducing two of them to produce CSAM, and his demonstrated financial means, the United States respectfully requests that the Court impose a special assessment of $5,000 under § 2259A, in addition to the mandatory $100 special assessment pursuant to 18 U.S.C. § 3013.

---

[5]Assessments collected under this statute are deposited in the Child Pornography Victims Reserve, which provides monetary assistance to victims of trafficking in child pornography, *see* §§ 2259(d) & 2259B, and shall be paid in full after any special assessment under § 3013 and any restitution to victims of the defendant's offense, *see* § 2259A(d)(2).

**E. Restitution**

Pursuant to 18 U.S.C. §§ 2259 and 3663, and the plea agreement, the defendant must pay every victim the full amount of the victim's losses as determined by the Court.[6] *See* 18 U.S.C. § 2259(a), (b)(1). Pursuant to Section 2259(b)(2)(B), the Court must order restitution to each victim in an amount not less than $3,000.

The government has received a restitution request from the father of MV1 and has provided it to defense counsel. Notifications of other identified and known victims are still underway. If defense counsel is unable to reach agreements on the remaining restitution requests within 90 days of sentencing, the parties will request a separate hearing to determine the proper amount of restitution owed in this case.

To the extent any request comes from a victim whose images the defendant did not personally distribute, the defendant is nonetheless properly liable for restitution. Having been convicted of engaging in a child exploitation enterprise whose plain purpose was to generate and distribute such images, the harm to every victim of the enterprise was reasonably foreseeable to the defendant and a natural and probable consequence of the enterprise in which he engaged. Co-conspirators are liable for the reasonably foreseeable acts of one another taken in furtherance of the unlawful agreement. *See United States v. Gillespie*, 27 F.4th 934, 941 (4th Cir. 2022) ("Under the *Pinkerton* doctrine, defendants are vicariously 'liable for substantive offenses committed by a co-conspirator when their commission is reasonably foreseeable and in furtherance of the conspiracy.'") (quoting *United States v. Hare*, 820 F.3d 93, 105 (4th Cir.

[6] 18 U.S.C. § 2259(b)(1) refers to a separate rule, contained in § 2259(b)(2), for defendants convicted of "trafficking in child pornography." The defendant stands convicted of an offense categorized by § 2259(c) as "child pornography production," rather than "trafficking in child pornography," so § 2259(b)(2) is inapplicable. *See* 18 U.S.C. § 2259(c)(1) (defining "child pornography production" as "conduct proscribed by subsections (a) through (c) of 2251 . . . section 2252A(g) (in cases in which the series of felony violations involves at least 1 of the violations listed in this subsection) . . . ."). The series of felony violations here includes at least three violations of § 2251. Dkt. 34 at 8.

2016)); *United States v. Baker*, 432 F.3d 1189, 1235 (11th Cir. 2005). If criminal liability may rest on that principle, restitution—a non-punitive measure designed to make victims whole—certainly may as well. That result is also consistent with the plain language of the statute, which defines a "victim" as "the individual harmed as a result of the commission of a crime under this chapter," 18 U.S.C. § 2259(c)(4), and with the offense of conviction itself, which requires as an element that the defendant committed at least one predicate felony "in concert with three or more other persons." 18 U.S.C. § 2252A(g). The enterprise's members shared what they obtained precisely so that each man's victim became every man's. Dkt. 34 at 4(a), (d).

**F. Forfeiture**

The parties previously filed a consent order of forfeiture encompassing the electronic devices the defendant used in furtherance of the offense of conviction or that contained depictions of minors engaged in sexually explicit conduct. Dkt. 35.

## CONCLUSION

The defendant took the one skill that most distinguished him—a professional's ability to earn a child's trust—and made it the instrument of an enterprise built to strip that trust from children for the sexual gratification of adult men. He did it to a 14-year-old with Down Syndrome after confirming she could not read well. He did it to a 10-year-old doing her summer homework. He did it for years, behind a VPN and five passcodes, and he was still doing it the day before agents came to his door. The United States respectfully requests that this Court sentence the defendant to 30 years of imprisonment and a lifetime of supervised release.

Respectfully submitted,

Todd W. Blanche
Acting Attorney General

Date: September 29, 2026

Theophani K. Stamos
First Assistant United States Attorney

By: /s/

Vanessa Strobbe
Lauren Halper
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3708
Fax: (703) 299-3980
Email: vanessa.strobbe@usdoj.gov